Case No. 14-1099 et al., Fortuna Enterprises, LP, Petitioner v. National Labor Relations Board. Mr. Lucchi for the petitioner, Mr. Sororski for the respondent. If it pleases the Court, Stephen Lucchi for Fortuna Enterprises Petitioner in this matter and I would like to reserve three minutes for rebuttal. With as little destruction of one as is consistent with the maintenance of the other, a concept, actually a directive, set forth in Babcock and Wilcox, Hudgens, and in the opinion of this Court. In its previous decision in this matter, the Court noted, quoting Hudgens, the proper resolution in a given case depends on the nature and strength of the respective Section VII rights and private property rights involved. We agree. Unfortunately, the NLRB, in our view, completely ignored or at least misconstrued a proper balancing of interests initially. How can, with a ten-part test, and when the Board ends up saying, okay, the one that we probably got it wrong on, on Factor IV, wasn't that important in the ten-part test and they did everything we asked them to do, right? But when you got this ten-part test, how in the world are we supposed to say they didn't balance it correctly? That's what you're up against. Why didn't you challenge the ten-part test? Your Honor, there are a couple of responses to that. Number one, we think, as the Court did, that the ten-part test may not permit an effective balancing of interests that Babcock and Wilcox requires. We think, instead, that the focus should be on Babcock and Wilcox, rather than on QuietFlex, but on balance. Did you make that? You haven't challenged QuietFlex, have you? I'm sorry? You didn't challenge the test. No, we didn't. You challenged the application of it. Correct. Okay. With respect to QuietFlex, and as noted by Concerning Member Johnson in the underlying Board decision here. So the grievance procedure, just to focus in on my concern that I have in this case. The grievance procedure is the thrust of your argument, that there was a grievance procedure in place. But there were these, what you can characterize as confusing comments from Samoya about, we're going to try to locate Coonley, and that that could have misled the workers into thinking that they didn't have to report back to work at the time. So what do we do with that fact? So let's, putting aside QuietFlex, and you're relying on the grievance procedure, but the problem here seems to be this fact that there was some confusion in the discussions. In other words, Samoya didn't say, apparently, you have to go back to work now. Coonley's not coming. Cook's not coming. What do we do with that? I have several suggestions, Your Honor. Number one, the court in its earlier decision said that the hotel was under no obligation to inform the employees. So I read that line, and I think that's true. Obviously, we take that as true, but there seems to be more than just an omission here, at least the fact found by the board. There seems to be an affirmative statement, and I know we could argue the facts one way or another, but the board found an affirmative statement by Samoya that seemed to indicate to the workers that she was trying to locate Coonley. And weren't there others as well? The security officer, others said the same thing. Yeah, we'll try and find him. We're waiting to hear as well. What would be unreasonable about the workers staying there until they were told, no, they're not going to come see you? On several responses again, Your Honor, number one, the strikers were well aware before the strike started that neither Coonley nor Cook, the food and beverage director, were available. But why didn't she say that then? She didn't know that. There was an unbelievable amount of confusion where initially there were 100 strikers in the cafeteria. Right, I understand that. The confusion seems to, on this factual point, may cut against you, doesn't it, because they weren't aware. It wasn't just that they weren't aware. They were told, okay, we'll try to locate Coonley. In other words, the mixed messages point that the concurring member relied on below. The strikers were aware that Coonley and Cook weren't available. Semioya told Miguel Vargas, the strike leader, at 8.26 a.m. that Coonley was on the property and not available and that she'd try to get a hold of him. Vargas, before he- Wait a second, what was that last clause you did? And she would try to get a hold of him. What are the strikers supposed to make of that? I think she made, or was trying to make, a good faith effort to control the strikers because it was a fairly boisterous scene. Yeah, by telling them, you may be able to get what you want. You want to talk to these folks? You might be able to get it. And that was said by three different people over the course of an hour or so. The hotel, Your Honor, didn't even know the purpose of the strike until 9 o'clock when another strike leader, Patricia Simmons, placed a phone call to the Human Resource Department of the hotel. The confusion on both sides was enormous, in our view, and we never got a reason as to why the strikers wanted to talk with Coonley or Cook. Coonley and Cook were both not available. The strikers knew it. And in our view, the reason for the strike, the ultimate reason for the strike, was the suspension pending investigation of a co-employee, Sergio Reyes, who was suspended pending investigation for stealing from a guest. That's a pretty serious issue in a hotel. That investigation was ongoing at the time. And in our view, when you look at factors one, together with factors four and seven about the availability of an effective grievance procedure. On that, to turn to a legal question, it seems to me that your position is that there's a fact, when there is a grievance procedure, then the employees are not allowed to have an on-site work stoppage. Is that your position? It's not that they're not allowed, Judge Kavanaugh, but as the court earlier found, that factor weighs against the protection of a job action. So it's not a per se rule? No, it's not a per se rule. And what, in those circumstances, what could overcome, what facts could overcome the grievance procedure to allow the workers to still have an on-site work stoppage, even though there was a grievance procedure? In this particular case, Judge Kavanaugh? Just generally, yes. We don't believe that there were factors that permitted a work stoppage. There are cases where the board has said that, and courts have agreed, that a reasonable amount of time for a work stoppage is permissible, even if there is a grievance procedure. But in the cases cited in brief, the unifying factor where work stoppages were found to be unlawful were in those cases where grievance procedures actually existed, and as we have here. The other factor that we think the court needs to focus on is how attenuated the reasoning for the strike was. This wasn't about employees' own working conditions. It was about... They thought the co-worker had been disciplined, and they might be wrong about this, but they thought the co-worker had been disciplined for organizing activities. I mean, they could be completely wrong about that, but that was what was stated. That's what was stated, but they knew better. Reyes told Vargas himself that the reason he was suspended pending investigation was for stealing from a guest. Vargas knew that. Vargas was a server in the cafeteria. He... Or in the cafe, I'm sorry. Did the board make a finding about that, about the reason for the work stoppage? The board's view was that the employees struck because they were concerned that Reyes was actually suspended for his union activities. That's the board's finding, right? And so what are we to do with that? There's actually no factual evidence to establish that Reyes had engaged in union activity. What is in the record and is established... Do you have any point at this point whether the Wildcat Strikers could have, or did, act in the belief that that was the reason for Reyes being disciplined? There's testimony to that effect, Judge Nantelli. Isn't that the question for us? They don't have to be right. We don't have to... I get your question, but you're not really saying we have to be correct in order to protect someone. No, Your Honor, we're not. What we are saying is that when you weigh the reason for the strike, which is attenuated, versus the existence of an effective and ongoing grievance procedure... Isn't there a finding that the reason for the strike was the concern that Reyes was being disciplined for his organizing activities? Yes, Your Honor. Okay, thank you. But my quarrel, my question, with the way you're formulating it is you're leaving out a really important factor that Judge Kavanaugh referred to in my earlier question referred to as well, and that is that there's evidence that the workers were told, and I believe it's by three different people on three different occasions, in effect, hang in there, we're going to see if we can get them to you. We're going to see if we can get these people that you want to talk to, these folks, we're trying to see if they can get there. And in my mind, that changes the factoring quite a bit. If that had never been said, I think you have a much stronger case. But that was said on three occasions. It was said, Your Honor. And couldn't they think, related to Judge Griffith's question, that they actually were following the grievance policy, and there's footnote 25 of the Board's opinion, because the memo had said you can use the cafeteria during breaks for bringing things to the attention of supervisors and managers. That is a leap of faith taken by the Labor Board that is simply unsupported by fact. Simply because the hotel modified its policy to say that the cafeteria was the only proper place for employee breaks does not, by any stretch of the imagination, particularly in light of the history of group grievances, state that they could only do grievance meetings with hotel managers in the employee cafeteria. Well, it also didn't just say breaks. It said that was a place you could discuss your individual workplace concerns with your supervisor, your manager, or human resources. I don't believe that's correct, Judge Kavanaugh. Well, that's what the Board said the memo said, so I'd have to double-check that. But in footnote 25, that's what the Board says the memo says. Coming back to the issue of what employees were told in the cafeteria, I think, Judge Griffith, to your point, to Judge Kavanaugh's point, that has to be weighed against what the strike organizers and strikers actually knew. They knew, unlike Samoyoa and unlike Luis Gallardo, the security guard, they knew that both Kunle and Cook were not available to meet with them. That had been specifically told to Vargas by Samoyoa with respect to Kunle at 826 a.m. Before the strike even began, 8 o'clock in the morning, Cook and Vargas had a conversation. Vargas said, we're leaving. We're going down to the cafeteria, and we need you to come, too. Cook responded, I can't. I'm going to have to stay here and take care of the guests in the restaurant that you're about to abandon. That's what actually happened, and that's what actually the strikers knew, notwithstanding the fact that neither Samoyoa nor the security guard had any idea about whether they'd be able to get a hold of Cook or Conley. In any event, in our view, East Tex says it best. It is true, of course, that some protected activity bears a less immediate relationship to employees' interest as employees than other activity. We may assume that at some point the relationship becomes so attenuated that an activity cannot fairly be deemed to come within the mutual aid or protection clause. We think that's exactly what happened here. Employees had... Notice your time's up. We'll give you back a couple minutes for rebuttal. Thank you, Your Honor. Counsel, I want to congratulate you on your choice of tie. Thank you, Your Honor. Especially with the name of this case. I felt it appropriate. May it please the Court... And the fact that you have Judge Kavanaugh on the bench. That helps, too. May it please the Court, Edward Swedriski for the Labor Board. The Board did three things on remand in this matter in accord with the Court's prior decision. First, the Board re-evaluated two factors. Those are Quiet Factors 4 and 7 in light of the Court's finding that the company's open-door policy, in fact, encompassed group complaints. And the Board entirely agreed with that finding. Second, the Board clarified one of the factors, that's Factor 3, which deals with whether a work stoppage interferes with production. And finally, the Board reconsidered its overall balance of the factors to determine that this work stoppage was indeed protected under the Act. To begin with, Factors 7 and 4, the Board reasonably assessed the impact of the open-door policy on both of those factors. Factor 7, which deals with the availability of... But the Board's reasoning seems to subordinate the grievance policy to a number of other factors when the grievance policy would seem to be extremely important. And, you know, as Judge Griffith said, it's got this 10-factor test, but it does seem, if you look back at all the case law, that the grievance policy is really a key if there is such a thing. And I'm not sure the Board's opinion really is consistent with that case law in that sense. I think the concurring member's opinion points out the flaws potentially there. So what do we... How do you respond to all that? The case law, the fact that grievance policy seems to be a key factor. Your Honor, well, I wouldn't say that the Board subordinated this factor or either of these factors. Again, many considerations are in play. What the Board did was say that the availability of the grievance procedure isn't decisive, especially when the other factors either all favor protection or at least don't weigh against it. Didn't the Board say that in response to our observation first time around, that it appeared that that was critical to the whole decision-making process here? So... That the first time around, the Board missed it, right? The Board overlooked the fact that there was this grievance procedure. And when we sent it back, we said, okay, so now account for that. And how did they account for that? They got it wrong the first time. They said there was no grievance procedure, and so there was. Why does that change everything about this case? So the Board's explanation of that, well, first of all, I'll deal with the two potentially problematic cases which seem to underlie this that the Board distinguishes. And those are the Cone Mills case, Fourth Circuit case, and the Canberra manufacturing case. And as the Board notes, in both of those cases, the employer explicitly invoked the grievance procedure and stood firm on that procedure. In the Cone Mills case, the employer also explicitly rejected the employee's demands. And in the Canberra manufacturing case, where in fact the Board... The grievance policy would be hugely significant here, but for the fact that Samoya and others did not rely on the grievance policy alone in those conversations. So why don't we affirm on that basis? Or suppose we agree with the concurring member and think the Board might have gone too far. How do we resolve that here? I asked two different questions. So with respect... Well, I'll give a general answer. The Board did give significant weight to the fact that... bases its opinion on. And in fact, on page 6 of the Board decision, that's 981 of the appendix, the Board relies a lot on the belief that the employees had that Coonley or Cook might get and meet with them. And the Board's words demonstrably contributed to the employees' decision to persist in the work stoppage for as long as they did. And again, that consideration impacts many of the factors. And so I do think that's a crucial point here. I think the difference between the majority and the concurrence is simply the relative assessment of the weights. But how long into the work stoppage were they first told that there might be an opportunity to speak with management? So I believe after the third warning that SEMAOA gave to the employees, that's when a dialogue began to develop. So what if she had not said that? What if she had given the two warnings and then the third time just warned them again and didn't say anything about, well, okay, I'll try and get ahold of them? What do we do with a case like that? I think that would be a different case, and I can't speak to it. Yeah, that's why I asked. I can't speak to exactly what the Board would decide. But so in that case, the suspensions would have still come down about one hour into the work stoppage. And based on the many cases that the Board relies on in assessing the length of the work stoppage, a one-hour work stoppage would still fall well into the protected length. With the existence of a grievance procedure? So I thought, I mean, we treat on-site work stoppages differently than strikes, right? I mean, there's this balance. And your opposing counsel reminded us at the outset that there's this balance between private property interest and organizing activity, right? And so you're telling me that a group of employees, with knowledge that there's a grievance procedure that can be followed, can conduct an on-site work stoppage for an hour in the face of at least two warnings to get back to work, and that's protected activity? That's the balance? Well, I would call, of course, attention to the Cambro manufacturing case, which was the second arguably problematic case here that the Board distinguished. And in that case, ultimately the Board found the work stoppage unprotected, and there was a grievance procedure in place. Again, the employees in that case were unrepresented. And the Board's reasoning, though, specifically noted that the work stoppage did remain protected for quite a while, and it was only after about three hours, three-and-a-half hours, that it became unprotected. And there were other considerations there, more specifically that the employees didn't. But in that case, in the Cambro case, the Board said in discussing the case law, in each of those cases the Court emphasized the absence of an established grievance procedure in finding that an employer unduly restricted the protected right of employees to present their grievances. In other words, that case does, and the other cases that are all cited, the Courts of Appeals cases, seem to really put a heavy reliance on the presence or absence of a grievance procedure. No? I think it's fair to read the cases as putting a significant weight on the grievance procedures. But in the specific circumstances of this case, and this is what the Board really does rely on, these conflicting messages. And this goes to Factor 4, which is different from Factor 7 in that Factor 7 just goes to the mere availability of the grievance procedure, whereas Factor 4 goes to the adequacy of the opportunity of the employees to present their grievances. And based on the fact that many management officials conveyed to the employees that they would possibly have a chance to convey the specifics of their grievance to the two senior managers that they wanted to talk with, based on that consideration, the Board felt that that was a cross-cutting consideration, the overall assessment here, that it weighed slightly for protection. Although the Board does note that this is not a decisive factor either, if the Court were essentially to disagree with the Board's assessment of Factor 4, it would not change the outcome in this case. Remind me if you would, and I don't have the Board's opinion in front of me, what the Board does with Factor 3 on the remand. I remember what they did before. What did they do with Factor 3 on the remand? So the Court raised an issue in its previous decision, noting that the Board's previous decision stated that it's not considered an interference with production that would weigh against protection if the only interference with the company's operations is due to the employees' cessation of their own work. Briefly put, we recognize that statement didn't make any sense. What did the Board do the second time with that? Well, the Board clarified that, and it went back to first- Tell me how they clarified it, because I don't have the opinion in front of me. Sure. My back won't let me carry that anymore. So in the Board's decision, they noted, first of all, many work stoppage cases, and this is footnotes 17 and 18 of the Board's decision, where the Board has relied on the fact that employees don't affirmatively interfere with the company's operations. And they also- What did they do with it with respect to this case? I mean, obviously, they did interfere with production. They had to change the whole method of serving in the dining room from the menu service, table service, to buffet. So what did they do with it in this case? In this case, the Board found that this factor weighs strongly in favor of protection, because there's no evidence that the employees- I'm really having a hard time understanding this. Well, there was no evidence at all in the record that these employees in any way blocked other employees who were not striking from entering any of the areas of the cafeteria. For example, the cafeteria itself, even though the company states that it does, the ALJ excluded as hearsay that evidence, and there wasn't a single employee- Their whole industry is serving people, right? It's hospitality industry. Yes. And it seems to be conceded that they did interfere with the production of that goal of the service of the guest. Well, there is some- Isn't the Board just restating what we found inadequate the first time on factor three, or what we questioned the first time on factor three? I think the Court the first time was just simply somewhat confused by the Board's statement. And so here the Board provided a more elaborate explanation, and it again goes back to a basic principle here was that if these employees had chosen to go off-site and do a picket line or some other sort of protected activity off of the hotel premises, the same sort of interference would have occurred with production. And for that reason, because those sorts of activities off-premises were undoubtedly protected- Was there any precedent for the Board to take this approach to what the word interfere means? Because I think at first glance when someone sees the word interfere, you would think that by not doing your work and requiring others to fill in for you, you're somehow interfering with production. But what was the authority the Board relied upon to say that that sort of common-sense meaning of interfere isn't what interfere means here? So it relied, first of all, on- and this is at footnote 17 of the Board's decision. That's at 980 of the appendix. It noted, for example, in the Canberra decision, the Board there specifically relied on the consideration that, quote, the employees there were entitled to persist in their protest for a reasonable period where, quote, the work stoppage caused little disruption of production by those who continued to work. And there are several court cases to the same effect. And then the Board also relied on just the more general principle that- So, I mean, as I understand it, what the Board said is, and you referenced this in one of your previous answers, is that none of these workers engaged in the on-site stoppage blocked any other worker from getting to work. I understand that. What I'm trying to get at is why should we understand the word interfere to be so limited? Because there's no question that the operation of the hotel, it was interfered with, right? A hundred percent occupancy. They got late in getting people's rooms changed. And I know if I'm staying at a hotel and that happens, the service I'm buying has been disrupted. Why isn't that interference? So the Board relied heavily on Section 7 and 13, both of which affirmatively protect the right to strike. And so it starts from that basis. But as far as this interpretation of interfere being reasonable, it's because the QuietFlex test focuses on property rights. And to the extent that property rights are implicated here, it's because of the employees remaining on the premises. And so the only sort of interference that's tied has some sort of a nexus to that interference. Number three is stated, correct me if this is a wrong quotation, whether the work-stopping interference, or deprived employee access to the property, if it put in a disjunctive, and it would seem that it's enough to make effective way in favor of management, if you would, that the work-stopping interfered with production. If Kevin, excuse me, Judge Griffiths suggests there is no question this interfered with production. So I see my time has expired. Yeah, go ahead. So I guess, again, the point is that the only extent to which this particular work-stoppage may have interfered with production. Which is relevant to the consideration of balancing property rights is to the extent that there will be. You're saying it's got to be somehow different than if it were an off-site strike, right? Yes, and so in this case. So it added a gloss to QuietFlex. In essence, the board on remand said, QuietFlex said X, but we are adding a gloss to that, which maybe the board can do. Well, again, I would note that the many cases that the board cites as acknowledging this interpretation of interference. But also, just the QuietFlex test itself, I think test is a misnomer. It was a restatement essentially collecting many various considerations that the board over decades had developed. It was attempted rationalizing or at least laying out those considerations. And to the extent that it may have been too broadly worded, I think this case goes a long way toward providing better guidance on this factor. Thank you. Thank you very much. Counsel for Petitioner, we'll give you back two minutes. Thank you, Your Honor. For rebuttal, only for rebuttal. Only for rebuttal. Then we'd like to talk about factor three, interference with production. Because that was a concern of the court, certainly a concern of Petitioner as well. What the board did on remand was essentially state that there is always going to be an interference with production, a strike situation. It's a non-site work stoppage. It is a service industry employer. We argued that brief. It does make a difference whether the board agrees with that or not. We had 100% occupancy on the day of the strike. But isn't there board precedent that said that they weren't making new law here, were they? Isn't there board precedent that says the inquiry that you're supposed to engage in is to ask whether the interference with production here is like or dissimilar to the interference with production that would occur in an off-site strike. And they're saying, no, it's the same. Nothing happened here different than if they had formed a picket line outside. Workers are gone, so new people need to fill in. And that's not, there's board precedent that says that's not the type of interference with production that cuts against the union hearing. Isn't that right? Or have I misstated it? No, I think you're absolutely correct, too. But what the board said with respect to interference with production is, was there an interference with the work of other employees? And the answer to that, although the board didn't state it, is absolutely yes. How was it any different than if there had been a picket line formed outside with these 77 to 100 employees? What's the difference between that and what happened here? There is no difference, Your Honor. That would happen anyway. So you're saying, so the board's law on this is just wrong? We think that that factor is not as important as four and seven. I see. Okay. There are no further questions. Thank you very much. Thank you very much. The case is submitted.
judges: Griffith, Kavanaugh, Sentelle